# In the United States Court of Federal Claims

No. 10-152L

(Filed: December 16, 2010)

| | |
|---|---|
| **NATIONAL FOOD & BEVERAGE CO., INC.,** ) ) ) ) **Plaintiff,** ) ) **v.** ) ) **UNITED STATES,** ) ) **Defendant.** ) ) | Takings claim arising from government's removal of clay from plaintiff's property to repair levees damaged by Hurricane Katrina; motion to dismiss; RCFC 12(b)(6); motion to stay |

Darrell K. Cherry, Deutsch, Kerrigan & Stiles LLP, New Orleans, L.A., for plaintiff.

Brook B. Andrews, Natural Resources Section, Environmental & Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Ignacia S. Moreno, Assistant Attorney General, and James D. Gette, Environmental & Natural Resources Division, United States Department of Justice, Washington, D.C.

**OPINION AND ORDER**

LETTOW, Judge.

This case concerns an alleged taking by the government of property for public use without providing just compensation to the property owner. After levees were damaged by Hurricane Katrina, the United States Army Corps of Engineers ("Corps") needed relatively impermeable clay to effect repairs to the levees. The Corps identified suitable deposits of clay in Mississippi and southern Louisiana, and, respecting one such deposit in southern Louisiana, entered into an agreement with Plaquemines Parish to use the Parish's authority under state law to commandeer access to the property. The Parish duly commandeered access to land owned by the plaintiff, National Food and Beverage Company, Inc. ("National Food"), the Corps entered upon the property, and, over several years, a firm under contract to the Corps removed clay from the property and that clay was used by the Corps to repair damaged levees. To this date, National Food has not been paid for the removed clay.

National Food has filed suit to be compensated for the clay and for concomitant use of portions of its property on a temporary basis attendant to the Corps' actions. The government has moved to dismiss National Food's takings claim under Rule 12(b)(6) of the Rules of the

Court of Federal Claims ("RCFC") and has also asked that the case be stayed pending the resolution of a subsequently filed action pending in the Eastern District of Louisiana which involves the portion of National Food's property from which the clay was removed.

## BACKGROUND[1]

### A.  *The Cooperation Agreement and the Government's Actions*

Hurricane Katrina decimated southern Louisiana on August 29, 2005. Following the storm, the Corps acted pursuant to 33 U.S.C. § 701n to undertake repairs to federally-authorized hurricane-protection levees in Plaquemines Parish that were damaged by the hurricane. Am. Compl. ¶ 5. In preparation, the Corps conducted a series of Environmental Assessments entitled "Response to Hurricanes Katrina and Rita in Louisiana, Environmental Assessment." *See* Pl.'s Mem. in Opp'n to the U.S.A.'s Motion to Dismiss ("Pl.'s Opp'n") Ex. 6 ("EA #433"). A total of 63 sites were identified by the Corps' "borrow team,"[2] most of which were located in Mississippi. *Id*. Plaquemines Parish, however, had a significant deposit of relatively impermeable clay, and that site was identified for use in a report styled "Project Information Report, PL 84-99, Rehabilitation of Damaged Hurricane or Shore Protection Projects from Hurricane Katrina, New Orleans to Venice, LA Hurricane Protection Project, Plaquemines Parish, LA" ("Project Information Report"). *Id*. Ex. 3 (Amendment to Cooperation Agreement between the United States of America and Plaquemines Parish Government for Rehabilitation of a Federal Hurricane/Shore Protection Project (signed Jan. 17 and Jan. 19, 2006) ("Am. Cooperation Agreement"), at art. I.A. The Project Information Report was prepared by the Corps' District Engineer, New Orleans District, on October 17, 2005, and was approved by the Division Engineer on October 19, 2005. *Id*. A revised Project Information Report was prepared by the Corps' District Engineer on January 5, 2006, and approved by the Division Engineer on January 10, 2006. *Id*.

Representatives of the Corps met with officials of Plaquemines Parish respecting the clay deposit, and in October 2005, the Corps and the Parish entered into a Cooperation Agreement to facilitate the repairs contemplated by the Federal Hurricane/Shore Protection Project ("Federal Hurricane Protection Project"). *See* Am. Compl. Ex. A (Cooperation Agreement, Oct. 24, 2005).[3] The Cooperation Agreement was amended on January 17 and 19, 2006. *See* Am. Cooperation Agreement at 10.

---

[1]For the purposes of resolving these motions, the court presumes that allegations in National Food's complaint are true. The recitation of facts is provided solely for purposes of providing a background for analysis of the pending motions and does not constitute findings of fact by the court. However, unless otherwise noted, the facts set out appear to be undisputed.

[2]Borrow material is material which has been dug up for use as fill in another location.

[3]The construction of levees was initially authorized in Pub L. 87-874, 76 Stat. 1173, 1184, Tit. II, § 203 (Oct. 23, 1962).

In the Amended Cooperation Agreement, Plaquemines Parish agreed to use its emergency powers, as set forth in La. Rev. Stat. § 29:721-738,[4] to commandeer privately-owned "land, easements, and rights-of-way, including suitable borrow and dredged or excavated material disposal areas" "determined by the [United States] [g]overnment to be necessary for the construction, operation[,] and maintenance of" the government's efforts to repair and rehabilitate damaged hurricane and shore protection projects. Am. Cooperation Agreement, arts. III(A), III(A)(3)(a). The parish further agreed that it would grant to the federal government a "right of entry" to the property commandeered under the Cooperation Agreement. *Id.*, art. III(A)(3)(c).

In turn, the United States government agreed to "identify and pay just compensation to the owners of compensable interests" in the property to which Plaquemines Parish would provide entry. Am. Cooperation Agreement, art. II(B)(1). The federal government and Parish also included in their agreement a clause which declared that each of the parties was acting "in an independent capacity in the performance of their respective functions under the Agreement, and none of the parties [were] to be considered the officer, agent, [or] employee of the other parties." *Id.*, art. VIII.

On January 26, 2006, the President of Plaquemines Parish, Benny Rousselle, signed an order commandeering approximately 77.2 acres of land owned by National Food. Am. Compl. ¶ 17; *id*. Ex. C (Commandeering Order, Jan. 26, 2006).[5] The order specified that the property was commandeered "without the permission of the property owner(s)" and that "notice and hearing [was] suspended until after the date of completion of construction of the [Federal Hurricane Protection] Project." *Id*. Ex. C, at 1. The Department of the Army, its agents, employees, and contractors were authorized by the order "to gain access" to National Food's land "to obtain borrow, to stockpile and process material, and to construct (repair and rehabilitate)" the New Orleans to Venice Hurricane Protection Levees in Plaquemines Parish. *Id*. The right of entry granted by Plaquemines Parish to the Army would remain valid "until completion of [the] . . . emergency construction work beginning with the date possession of the land is granted." *Id*.

National Food alleges that the Corps and its agent entered upon its property and that between early 2006 and September 30, 2007, the Corps' agent, The Shaw Group, removed a large amount of clay from its land, which clay was transported for use in levee repairs. Am. Compl. ¶¶ 22-23. The Corps' Environmental Assessment #433 represents that the Corps' acquired 1,193,000 cubic yards of levee-approved clays, leaving a pit on National Food's land which would require 2,386,000 cubic yards of backfill. *Id*.; EA #433. To date, National Food has not been compensated for the clay removed from its property, nor has the pit been backfilled.

---

[4]Particularly, La. Rev. Stat. § 29:727(F)(4) grants a parish president the power to "commandeer or utilize any private property if he finds this necessary to cope with the local disaster."

[5]Commandeered were approximately 32.8 acres for borrow material, approximately 36.7 acres for a stockpile and processing area, and approximately 7.7 acres for access corridors extending to and from La. Hwy. 23. Am. Compl. Ex. C (Commandeering Order).

B.     *Procedural Posture*

National Food filed a complaint in the Court of Federal Claims on March 9, 2010, and amended its complaint on July 20, 2010.[6] The company raises alternative claims for relief. First, National Food raises a Fifth Amendment takings claim, asserting that the clay removed from its property was inversely condemned by the Corps and that the Corps and its agent used portions of its property on a temporary basis to stockpile and then transport the clay offsite. Alternatively, National Food argues that it is the third party beneficiary of the Cooperation Agreement between Plaquemines Parish and the federal government and is thereby owed the compensation the federal government agreed to pay property owners in the Agreement. Am. Compl. at pp. 26-27 ("Prayer").

National Food seeks (1) payment at full market value for all clay removed from its land, which it alleges is in excess of $12 per cubic yard, (2) the cost of backfilling the borrow pit, (3) the cost of repairing other areas of National Food's land used by the Corps for staging areas and for transportation, (4) the cost of repair to fences, roads, and drainage works damaged by the Corps, (5) the value of the use of the land while the Corps occupied it, (6) increases in drilling costs caused by the Corps' occupation and use of National Food's land, (7) other damages to the value of the land or resulting from the use of the land, (8) attorney's fees, and (9) interest on the damages from the date of taking. Am. Compl. ¶ 24. National Food alleges the damages may exceed $45 million. *Id*. Further, National Food alleges it was deprived of the economic opportunity to sell some of the removed clay, which it believes could have been sold for $36 per cubic yard. *Id*. ¶ 25.

Slightly over six months after the filing of National Food's complaint in this court, on September 14, 2010, the government filed a condemnation action in the Eastern District of Louisiana against some of the land at issue in this lawsuit. Compl. in Condemnation, *United States v. 46.26 Acres of Land, More or Less*, Civ. No. 10-3062 (E.D. La. Sept. 14, 2010), ECF No. 1. In support of that condemnation, the government deposited $117,000 into the registry of the district court. That condemnation action seeks to take permanently a portion, but not all, of the land which had been commandeered temporarily after Hurricane Katrina. *Id*. National Food objected to the condemnation, arguing that no public purpose exists for the government's purported taking of the land because the clay had previously been removed. *See* Motion to Stay or Rescind Order of Possession at 29, 46.26 Acres of Land, Civ. No. 10-3062 (E.D. La. Oct. 11, 2010), ECF No. 12.

In the instant case, the government has filed several motions, including one to dismiss National Food's takings claim and another to stay the case pending the resolution of the government's condemnation suit in the Eastern District of Louisiana. Def.'s Mot. to Dismiss at 1; Def.'s Mot. to Stay Proceedings at 1.

---

[6]National Food, along with Midway Cattle Ranch LLC, also filed a lawsuit in Plaquemines Parish against the Buras Levee District, Plaquemines Parish, the Plaquemines Parish government, and the Plaquemines Parish West Bank Levee District, on January 25, 2007. That lawsuit apparently has not progressed beyond its initial stages.

## STANDARDS FOR DECISION

A.  *Motion to Dismiss*

The government's motion to dismiss bears only on National Food's claim that the Corps undertook and completed an inverse condemnation of the clay removed from its property and temporarily used portions of its property to carry out that removal.  The government's motion to dismiss does not affect National Food's claim that it was a third-party beneficiary of the United States' cooperation agreement with Plaquemines Parish and is owed the benefit of the contract. "To survive a motion to dismiss [for failure to state a claim upon which relief can be granted], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, __ U.S. __, __, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The allegations contained in the complaint must indicate to the court that there is "more than a sheer possibility that a defendant has acted unlawfully;" "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 129 S.Ct. at 1949-50 (citing *Twombly*, 550 U.S. at 555, 556).

In performing this analysis, the court must construe the allegations of the complaint in the light most favorable to the plaintiff.  *See Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995); *see also Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir. 1989).  It must decide "'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'"  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)), *overruled on other grounds as noted in Francis v. Giacomelli*, 588 F.3d 186, 192 n.1 (4th Cir. 2009)).

B.  *Motion to Stay*

"The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."  *Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936).  Whether and how to stay proceedings is within the sound discretion of the trial court.  *Cherokee Nation of Okla. v. United States*, 124 F.3d 1413, 1416 (Fed. Cir. 1997).  However, this discretion is not unbounded.  *Id.*; *see also Hendler v. United States*, 952 F.2d 1364, 1380 (Fed. Cir. 1991).  For example, a stay that is "immoderate or indefinite may be an abuse of discretion." *Cherokee Nation*, 124 F.3d at 1416 (citing *Landis*, 299 U.S. at 257 ("The stay is immoderate and hence unlawful unless so framed in its inception that its force will be spent within reasonable limits, so far at least as they are susceptible for prevision and description.")); *see also Landis*, 299 U.S. at 255 ("[A] stay of infinite duration in the absence of a pressing need" may constitute an abuse of discretion.).  Ultimately, a court must exercise its own judgment, "weigh[ing] the competing interests and maintain[ing] an even balance" among the competing interests favoring a stay and the interests frustrated by such action.  *Cherokee Nation*, 124 F.3d at 1416 (quoting *Landis*, 299 U.S. at 255).

"The proponent of a stay bears the burden of establishing its need."  *Clinton v. Jones*, 520 U.S. 681, 708 (1997).  To justify suspending the regular course of litigation, the proponent "must

make out a clear case of hardship or inequity in being required to go forward if there is even a fair possibility that the stay for which he prays will work damage to someone else." *Landis*, 299 U.S. at 255.

## ANALYSIS

### A.   *Motion to Dismiss*

In moving to dismiss National Food's takings claim, the government contends that "any liability for inverse condemnation lies with Plaquemines Parish" because "[p]laintiff's property interests were acquired by [the] Parish before the Corps ever entered onto [p]laintiff's property to undertake the levee rehabilitation and reconstruction effort."  Def.'s Mot. to Dismiss at 1; Def.'s Mem. in Supp. of Mot. to Dismiss at 7 ("Def.'s Mem.").[7]

For a plaintiff to establish a viable takings claim, it must allege that it had (1) a "property interest for purposes of the Fifth Amendment," *Members of the Peanut Quota Holders Ass'n v. United States*, 421 F.3d 1323, 1330 (Fed. Cir. 2005), and (2) that the government's actions "amounted to a compensable taking of that property interest," *American Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004).  The government claims that National Food has failed to allege sufficient facts which, if true, would satisfy either of these prongs.  The government argues that after the commandeering order was issued, National Food did not possess a "compensable property interest" in the land at issue, and therefore the federal government cannot be held liable to National Food for removing clay from the land after the order was issued. Def.'s Mem. at 13-14.  By similar reasoning, the government argues that its actions did not amount to a taking because the land had already been commandeered by Plaquemines Parish when the Corps entered the property, removed clay from it, and used portions of the property as staging areas and transport routes.  These arguments are sophistic and wholly lacking in substance.

### 1.   *Compensable interest.*

National Food's compensable interests are manifest.  Prior to the entry of the commandeering order, it held title to the property in fee simple and enjoyed unfettered possession of the property.  The commandeering order effected a right of entry to the property.  However, that order was not issued for a non-federal purpose.  Rather, it was issued by Plaquemines Parish to support the Federal Hurricane Protection Project, as the Amended Cooperation Agreement provides.  *See* Am. Cooperation Agreement, at 1-2 (whereas clauses).

---

[7]The United States has admitted that National Food "deserves appropriate compensation for the use and acquisition of [its] private property." Def.'s Mem. at 7.  However, despite its agreement with Plaquemines Parish that "the [federal] [g]overnment, subject to the availability of appropriations," would "pay just compensation to the owners of compensable interests" in property taken under the cooperation agreement, Am. Cooperation Agreement art. II(B)(1), the United States has not offered National Food compensation for the occupation of its land and removal of clay from the property.

As a result, as discussed *infra* in the next section, the commandeering order itself can be attributed to the federal government.

In addition, the commandeering order did not itself constitute a taking of the clay. Rather, while the order was in effect, National Food maintained an interest in the clay and the ability to make use of the clay. However, when the Corps caused the clay to be removed from the property, National Food's interest in it was permanently taken. The government's argument that National Food had no compensable interest in the clay while the commandeering order was in effect fails to recognize the temporal component of the commandeering order. The order effected a temporary taking of access to the clay deposit, but the Corps' physical removal of clay effected a permanent taking of the excavated material.

2.  *The government's actions.*

To prevail on its motion to dismiss, the government must also establish that National Food will not be able to demonstrate that the Corps' actions "amounted to a compensable taking of [its] property interest[s]." *American Pelagic Fishing*, 379 F.3d at 1372. The government argues that National Food cannot win on the merits because, as a matter of law, the allegations in National Food's complaint do not and could not establish that the Corps took anything from the plaintiff. As the government would have it, Plaquemines Parish independently chose to commandeer National Food's property, and only after acquiring the property did the Parish grant the Corps the right to use and remove materials from the property. In other words, according to the government, the Parish took the land from National Food, and the Corps only acted on what had already become the Parish's land. This contention wholly ignores the reality of what happened, and, tellingly, directly contradicts the position taken by the government in a closely related case, *Olivier Plantation, LLC v. St. Bernard Parish*, __ F. Supp. 2d __, 2010 WL 3923083 (E.D. La. Sept. 24, 2010).

In *Olivier Plantation*, the Corps was named as a third-party defendant in a suit brought by a landowner against a parish and levee district involving comparable facts. *See* __ F. Supp. 2d at __, 2010 WL 3923083, at *2.[8] The Corps filed a motion of removal of the case to federal district

---

[8] In *Olivier Plantation*, plaintiffs sued St. Bernard Parish and the Lake Borgne Basin Levee District ("Levee District") for taking their property under a set of facts nearly identical in all material respects to the case at hand. St. Bernard Parish and the Levee District entered into a cooperation agreement with the Corps that was comparable to the cooperation agreement at issue here. *See* __ F. Supp. 2d at __, 2010 WL 3923083, at *2. St. Bernard Parish commandeered the plaintiffs' property using an order similar to the one used in this case. The commandeering order granted St. Bernard "an assignable right and easement to clear, borrow, excavate and remove[] soil, dirt, and other materials from the [p]laintiffs' properties." *Id*. at *7. Additionally, the commandeering order granted the Levee District a right of entry "for its use in obtaining borrow, access and construction of the Levee for repair and rehabilitation." *Id*. The Levee District issued an authorization for the Corps to enter the plaintiffs' property and use the Levee District's right of entry. Pursuant to this authorization, the Corps entered the property and removed "large quantities of borrow material and caused damages through their access and construction activities." *Id*. Unlike in this case, however, plaintiffs' claim in *Olivier Plantation* was that the

7

court and then sought transfer to the Court of Federal Claims, supporting removal by arguing that "the extraction of materials from the plaintiffs' property and subsequent levee repairs was *exclusively a federal* — as opposed to state — *project*." Mem. in Opp'n to Pls.' Mot. to Dismiss and Remand and in Support of Transfer to the Federal Court of Claims at 3, *Olivier Plantation LLC v. Parish of St. Bernard*, __ F. Supp. 2d __, 2010 WL 3923083 (E.D. La. 2010) (No. 09-3581) (first emphasis added) ("Gov't's Opp'n in *Olivier Plantation*") (submitted as Ex. 4 of Pl.'s Opp'n).[9] The district court dismissed the third-party complaint against the Corps and remanded the case to state court, but in doing so, the court commented that "[p]laintiffs, if they deem appropriate in the future, may file a timely Fifth Amendment takings claim against USACE in the Court of Federal Claims." __ F. Supp. 2d __, 2010 WL 3923083, at *13.

In this case also, factually, the role of Plaquemines Parish was limited. In the Amended Cooperation Agreement, the Parish agreed to commandeer land chosen by the federal government to be necessary for the Federal Hurricane Protection Project and to grant the federal government a "right of entry" to the commandeered property. Am. Cooperation Agreement, art. II(B), art. III(A)(3)(c). It carried out those functions but that is all the Parish did. Each and every one of the actions to plan for the levee repair, to enter National Food's land and remove the clay, and to use the clay to effect repairs to the levee, were carried out by the Corps.

For the federal government to be liable to National Food, the plaintiff need not demonstrate that the Parish was acting as an agent of the Corps. *See Hendler*, 952 F.2d at 1378

---

Levee District's authorization to the Corps required the Levee District to compensate the plaintiffs. *Id*. at *2, *7. The cooperation agreement also provided, as it did in this matter, that the federal government would "identify and pay just compensation" to the owners of the commandeered property. *Id*. at *9.

[9]More specifically, in its memorandum, the United States argued that the St. Bernard's Parish case should be transferred to the Court of Federal Claims because the United States was responsible for the taking. The United States argued:

> In physically entering the property without obtaining a condemnation order for itself, the United States acted according to one of the several mechanisms, recognized by the Supreme Court, for the exercise of its eminent domain power . . . . [T]he extraction of materials from the plaintiffs' property and subsequent levee repair was exclusively a federal — as opposed to a state — *project*. St. Bernard's successful third-party demand against the United States was not based on a contractual 'indemnity *under the Amended Cooperation Agreement*' . . . , but precisely because the project was, from first to last, a federal project and undertaking, financed by the [f]ederal [g]overnment and pursuant to its mandates under several statutes . . . . Neither St. Bernard nor [the Levee District] have physically injured or modified plaintiffs' property in any manner. Instead, 'the alleged damage to the plaintiff[s'] property' was brought about 'by the USA's representative, the United States Army Corps of Engineers.'

Gov't's Opp'n in *Olivier Plantation* at 3-4 (internal citations removed) (emphasis in original).

("Common law agency is one test for determining the [g]overnment's responsibility, but it is not the only basis for establishing the [g]overnment's liability for the [s]tate's activities."). The Cooperation Agreement, the simultaneous commandeering of plaintiff's property and authorization for the federal government to enter it, and the physical removal of clay by the Corps illustrates that the government and the parish's actions were "two coordinate and coordinated parts of the same undertaking." *Id*. This undertaking was overwhelmingly an effort of the federal government, in which the parish had a very limited role. As the federal government itself argued in *Olivier Plantation*, "the project was, from first to last, a federal project and undertaking." Gov't's Opp'n in *Olivier Plantation* at 3.

The government contends that it should not be held liable for the taking because Plaquemines Parish did not need any agreement with the Corps to commandeer the property. But, as *Hendler* notes, "[t]hat the [s]tate had authority to act on its own initiative . . . is immaterial. It is no defense to a charge of authorizing someone to violate another's rights that the perpetrator might have done so on his own." 952 F.2d at 1379. The Parish only issued the order because the Corps had in the Cooperation Agreement asked the Parish to take that step. Most importantly, the Parish had no part in physically removing the clay from National Food's land. That effort was entirely undertaken by the Corps, pursuant to its own plan and for its own purposes.

The United States cannot circumvent the requirements of the Takings Clause by asking another sovereign to act on its behalf. *Cf., e.g.*, *Lustig v. United States*, 338 U.S. 74, 78-79 (1949) (finding, prior to the Fourth Amendment's incorporation against the states, that evidence is inadmissible when federal officers "participat[e]" in or "ha[ve] a hand in" efforts by state officials to conduct searches which would be illegal for the federal officers to conduct alone), *abrogated in another respect by Elkins v.United States*, 364 U.S. 206 (1960) (rejecting the statement in *Lustig*, 338 U.S. at 78-79, that "it is not a search by a federal official if evidence secured by state authorities is turned over to the federal authorities on a silver platter"); *United States v. Hensel*, 699 F.2d 18, 25 (1st Cir. 1983) (accepting district court's determination that Fourth Amendment protection against unreasonable searches applied when American authorities provided firepower, back-up assistance, and interpreters to help Canadian police seize a ship, although search was ultimately found to be reasonable); *United States v. Emery*, 591 F.2d 1266, 1268 (9th Cir. 1978) (finding Miranda warnings were required to be given in an interrogation conducted by Mexican authorities where DEA agents had "alerted the Mexican police of possible [illegal] activity, coordinated the surveillance at [an] airport, supplied the pilot for the plane and gave the signal that instigated the arrest once it was determined that [defendants were transporting illegal drugs].").

Following this theme, National Food has cited a number of cases in which courts considered whether the United States' involvement in another party's taking of private property was "sufficiently direct and substantial to require compensation under the Fifth Amendment." *National Bd. of Young Men's Christian Assoc. v. United States*, 395 U.S. 85, 93 (1969). The government has argued that cases which have applied the "direct and substantial" test have "repeatedly rejected the proposition that the United States can be liable for a taking based on the actions of a third party where . . . the third party 'has exercised its own discretion.'" Def.'s

Mem. in Response to Pl.'s Sur-Reply to Def.'s Mot. to Dismiss ("Def.'s Sur-Reply") at 2 (quoting *Texas State Bank v. United States*, 423 F.3d 1370, 1376 (Fed. Cir. 2005)).

      The focus on actions of a third party — Plaquemines Parish — is unnecessary. The court need not analytically look to the *YMCA* case and its progeny as a basis to examine the actions of Plaquemines Parish in deciding whether National Food has stated a claim against the government. Rather, the viability of National Food's takings claim rests straightforwardly upon direct action by the Corps. A takings claim will survive a motion to dismiss if the action that is the subject of the complaint is attributable to the United States. *See May v. United States*, 80 Fed. Cl. 442, 445 (2008) (citing *Erosion Victims of Lake Superior Regulation v. United States*, 833 F.2d 297, 301 (Fed. Cir. 1987)), *aff'd*, 293 Fed. Appx. 775 (Fed. Cir. 2008); *see also Arkansas Fish and Game Comm'n v. United States*, 87 Fed. Cl. 594, 615 (2009) (To win a takings claim on the merits, plaintiff must prove that the government's actions were the "direct and proximate cause" of the harms to its property interest.). The United States can be held liable for a Fifth Amendment taking if there is "physical invasion of or physical damage to a claimant's property by the United States or its authorized agents, . . . [or if] its own regulatory activity is so extensive or intrusive as to amount to a taking under the general principle of [*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922)]." *De-Tom Enters., Inc. v. United States,* 552 F.2d 337, 339 (Ct. Cl. 1977) (footnote and citations omitted); *see also Benenson v. United States*, 548 F.2d 939 (Ct. Cl. 1977) (holding that congressional legislation bearing on the Willard Hotel in the District of Columbia put such substantial and burdensome restrictions on the use of the property that a taking had occurred). In sum, the court need not ask whether the Corps' involvement with the Parish was "direct and substantial" when it is undisputed that the United States physically entered National Food's land and removed materials from it for the benefit of the United States' levee rehabilitation efforts. Moreover, given that the United States contended in *Olivier Plantation,* in a case involving nearly-identical circumstances, that it had "acted according to one of the several mechanisms . . . for the exercise of *its* eminent domain power," Gov't's Opp'n in *Olivier Plantation* at 3 (emphasis added), it is untenable to suppose that allegations of comparable facts made here by National Food would be so unavailing as to warrant dismissal. Accordingly, the government's motion to dismiss for failure to state a claim under RCFC 12(b)(6) has no merit.

                                                                   B.      *Motion to Stay*

      The government has moved for a stay pending the resolution of a condemnation action filed against a portion of National Food's property in the United States District Court of the Eastern District of Louisiana. The government argues that issuing a stay will "preserve judicial resources and the resources of the parties, will avoid the potential for duplicative or inconsistent rulings in two federal courts, and will allow [National Food] to be appropriately compensated for its property in the most appropriate federal forum." Def.'s Mot. to Stay Proceedings at 1. Each of these arguments is unavailing.

      The context of the condemnation action in the Eastern District of Louisiana is the salient factor in evaluating the government's motion to stay. Six months after this case was instituted, on September 14, 2010, the government filed a Complaint in Condemnation in the Eastern

District of Louisiana against some of the land at issue in this case. *See* Compl. in Condemnation at 1, United States v. 46.26 Acres of Land, More or Less, Civ. No. 10-3062 (E.D. La. Sept. 14, 2010), ECF No. 1. National Food contested the taking, arguing that there was no public purpose for the condemnation. *See* Mem. on Mot. to Stay or Rescind Order of Possession at 1-2, 46.26 Acres of Land, Civ. No. 10-3062 (E.D. La. Oct. 11, 2010), ECF No. 12-1. The court denied National Food's motion to rescind the taking, stating that the government's claim that the land is "necessary for the construction, repair and rehabilitation of the New Orleans to Venice Hurricane Protection Project" was sufficient to establish a public purpose. *See* Order, 46.26 Acres of Land, Civ. No. 10-3062 (E.D. La. Nov. 22, 2010), ECF No. 32 (order denying motion to rescind taking and motion to stay). The condemnation action thus is currently proceeding, and it is before a district judge who is also hearing three other condemnation actions related to the Corps' levee repair and hurricane protection projects. *See United States v. 0.166 Acres of Land, More or Less*, No. 09-3714 (June 3, 2009); *United States v. 0.088 Acres of Land, More or Less*, No. 09-3743 (June 3, 2009) (consolidated with *0.166 Acres of Land*, No. 09-3714); *United States v. 6.83 Acres of Land, More or Less*, No. 08-999 (Feb. 14, 2008).

The focus of the government's argument for a stay is its claim that the district court can determine just compensation for the condemned land, giving consideration not only to the value of National Food's property on the date the Complaint in Condemnation was filed, but also taking into account the value of the clay removed from the property in 2006-2007. The simplistic answer to the government's contention is that only a part of the land of National Food that is at issue in the instant case is also involved in the condemnation action now pending before the district court. The Corps occupied more land when it removed the clay in 2006 and 2007 than it took by the Complaint in Condemnation in 2010. Thus, the underlying premise for the government's motion to stay — that both the district court and this court would be able to render duplicative judgments — is factually incorrect.

Perhaps more importantly, however, the government is wrong on the law. The district court does not have the ability to award compensation for the occupation of National Food's land for a period that occurred and then stopped several years prior to the condemnation, nor may the district court address clay removal. Those takings claims by National Food are within the sole purview of this court.

The government's argument chiefly relies on *Georgia-Pacific Corp. v. United States*, 568 F.2d 1316 (Ct. Cl. 1978). In *Georgia-Pacific*, a claimant brought suit in the Court of Claims for an inverse condemnation, alleging that the government had physically seized its property. Soon afterwards the government filed a condemnation action in district court to take the same property, asserting the taking occurred on the date of the filing instead of the earlier date alleged by the plaintiffs in the Court of Claims. 578 F.2d at 1318. The government and the plaintiff disputed the correct date of the taking, and the Court of Claims granted a stay to allow the district court to determine which date of taking was appropriate. *Id*. at 1319. The court relied on *United States v. Dow*, which held that when the United States enters into possession of property before it formally acquires title, "it is the former event which constitutes the act of taking." 357 U.S. 17, 22 (1958) (quoted in *Georgia-Pac.*, 568 F.2d at 1320).

The facts of *Georgia-Pacific* differ in crucial respects from the facts of the alleged takings on National Food's property. In *Georgia-Pacific*, suits in both the Court of Claims and the district court involved the same taking of the same property right, creating a race to judgment between the courts and duplicative litigation costs. However, in National Food's case, this court and the district court are considering distinct and separate takings which address land that overlaps only in part, occurred at different times, and involve entirely separate operative facts. That there are two separate takings instead of one sets the facts of National Food's case apart from those of *Georgia-Pacific*.[10]

Additionally, in *Georgia-Pacific*, the United States allegedly had taken possession of land before the condemnation action was filed and continuously maintained the character of its presence through the beginning of the condemnation action. That is not the case here. National Food has alleged that the Corps removed clay from January 26, 2006, to September 30, 2007. There are no allegations that the United States was in possession of or used National Food's property after September 30, 2007. To link actions that concluded three years ago to a condemnation action filed in 2010 misapprehends the nature and scope of a direct condemnation. *See United States v. Land*, 213 F.3d 830, 838-39 & n.3 (5th Cir. 2000) (distinguishing *Georgia-Pacific* on similar grounds).

The difference between direct and inverse condemnations was expressly described in *Dow*. *Dow* explained:

> Broadly speaking, the United States may take property pursuant to its power of eminent domain in one of two ways: it can enter into physical possession of property without authority of a court order; or it can institute condemnation proceedings under various Acts of Congress providing authority for such takings. Under the first method — physical seizure — no condemnation proceedings are instituted, and the property owner is provided a remedy under the Tucker Act. Under the second procedure the [g]overnment may either employ statutes which require it to pay over the judicially determined compensation before it can enter the land, or proceed under other statutes which enable it to take immediate possession upon order of court before the amount of just compensation is ascertained.

357 U.S. at 21 (citations omitted). *Reunion, Inc. v. United States*, 90 Fed. Cl. 576 (2009), further explicates the distinction between inverse and direct condemnations, illustrating as how two different takings can occur on the same property. In *Reunion*, the government held over on its lease on a piece of property, while endeavoring to reach agreement with the property owner to

---

[10]National Food has argued that this case has priority under the "first-to-file" rule, because it filed its complaint in this court before the United States filed the Complaint in Condemnation. *See* Pl.'s Mem. in Opp'n to Mot. to Stay at 3 (citing *Alltrade Inc. v. Uniweld Prods., Inc.*, 946 F.2d 622, 625 (9th Cir. 1991)). However, the first-to-file rule is inapplicable here, because this action and the condemnation action do not involve "the same . . . issues." *Alltrade*, 946 F.2d at 625 (quoting *Pacesetter Sys., Inc. v. Medtronic, Inc.*, 678 F.2d 93, 95 (9th Cir. 1982)).

extend its position as lessee. Those discussions were not successful. After the property owner filed suit in this court, the government admitted to a "temporary physical taking of a leasehold interest" in the property from October 1, 2008, to December 31, 2009, advising that it was planning on filing a condemnation against the entire property on December 31, 2009. *Id*. at 580. The government "acknowledge[d] that any future filing of a Declaration of Taking . . . would not moot [the] action [in the Court of Federal Claims] because such a Declaration would have effect only prospectively." *Id*. at 578. More specifically, if and after the government filed a condemnation action, the Court of Federal Claims "action would remain viable for the period of the government's occupancy after the lease expired and before the Declaration of Taking was filed." *Id*. The direct condemnation the government planned to file would be a prospective permanent taking. In contrast, the taking of the leasehold interest was admittedly and intentionally temporary.

Entering a stay in a case such as this one, where there is no possibility for duplicative or conflicting decisions by the district court and this court, would disserve the goal of a "just, speedy, and inexpensive determination" of this action. RCFC 1. Accepting the government's argument would create a means for the federal government to avoid or delay paying compensation for inversely condemned property by tying up property owners in a procedural tangle. For example, hypothetically, if a plaintiff whose property had been inversely condemned and stripped of resources properly filed an action for compensation in this court, the government might then file an action in district court to condemn the now-barren property for a paltry sum and move for a stay in this court. If the stay were granted, the district court would proceed to decide the case before it but could not compensate the property owner for the inverse condemnation, rendering the stay effective only to consume time. *See Narramore v. United States,* 960 F.2d 1048, 1051 (Fed. Cir. 1992) (explaining that under the Tucker Act, 28 U.S.C. § 1491(a)(1), and the Little Tucker Act, 28 U.S.C. § 1346(a)(2), the Court of Federal Claims has exclusive jurisdiction to adjudicate inverse condemnation cases where damages exceed $10,000) (citing *Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1, 11-13 (1990)).

In short, this case and the condemnation action pending in district court involve wholly separate claims. Both must be litigated, and the rulings in one court cannot duplicate or be inconsistent with the other. For these reasons, a stay would be imprudent. The government's motion to stay is denied.[11]

### CONCLUSION

For the reasons set out above, the government's motions to dismiss and to stay proceedings are DENIED. The government's motion to stay filing of the answer pending adjudication of the motion for partial dismissal is GRANTED. The government shall file its answer to National Food's amended complaint on or before January 14, 2011. National Food's motion for leave to propound written discovery to the government is GRANTED.

---

[11]The government has also moved to dismiss the plaintiff's request for a jury trial and for estoppel under RCFC 12(b)(1). The government is correct that this court cannot hold jury trials. *See Webster v. United States*, 74 Fed. Cl. 439, 444 (2006). However, to the extent that the government seeks categorically to rule out particular forms of remedy, the request is premature.

It is so ORDERED.

                                                       s/ Charles F. Lettow  
                                                       Charles F. Lettow  
                                                       Judge